**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
NEWARK DIVISION

| | |
|---|---|
| VERONICA DOE, )<br><br>Plaintiff, )<br><br>v. )<br><br>RUTGERS UNIVERSITY, the State University<br>of New Jersey, & SCOTT STROTHER, in his<br>personal and official capacity, )<br><br>Defendants. ) | **CIVIL COMPLAINT &**<br>**DEMAND FOR JURY TRIAL** |

## INTRODUCTION

1.      Plaintiff, Veronica Doe ("Plaintiff" or "Ms. Doe"), by and through the L.L. DUNN LAW FIRM, PLLC, and LAFFEY BUCCI & KENT, LLP, hereby brings this action against Rutgers University (RU) and RU-Newark's Director of Title IX, Dr. Scott C. Strother (collectively "Defendants"), for their individual and collective deliberate indifference towards and negligence regarding an on-campus rape that Ms. Doe suffered from in a residence hall on March 6, 2020.

2.      Ms. Doe promptly reported the rape to Defendants, who refused to promptly investigate, resolve her complaint, or even issue protective measures ensuring her equal access to educational opportunities and benefits in the interim.  This allowed the rapist – a New Jersey Institute of Technology (NJIT) student, Tomasz P. Dulian (T.D.) – to freely access RU's campus due to the consortium relationship between NJIT and RU-Newark.  Such deliberate indifference towards Ms. Doe's safety and wellbeing on campus perpetuated the hostile environment arising out of the rape.

3.      The unremedied hostile environment caused Ms. Doe to suffer from severe and daily emotional distress throughout the 2020–2021 school year.  She constantly feared that T.D. may be nearby on RU's campus, wearing a mask to prevent identification during the COVID-19 pandemic.

1

4.     Defendants' ongoing refusal to ensure the safety and wellbeing of Ms. Doe on the RU-Newark campus following the on-campus rape, left her vulnerable to potential harassment and abuse. To ensure her own safety, wellbeing, and equal access to higher education, Ms. Doe transferred to another school across the country to complete her undergraduate degree in the summer of 2021.

## JURISDICTION & VENUE

5.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because some of Plaintiff's claims assert a federal question.

6.     This Court has supplemental jurisdiction over this action pursuant to 28 U.S.C. § 1367 because the state law claims are so related to the federal claims that they form part of the same case and controversy.

7.     This Court has personal jurisdiction over Defendants pursuant to Fed. R. Civ. P. 4(k)(1) because Defendants are located and conduct business in this jurisdiction and because the conduct giving rise to this action occurred in this judicial district.

8.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391 because all acts and omissions that form the basis of this action occurred in this judicial district.

## PARTIES

9.     Plaintiff Veronica Doe[1] is a 20-year-college student whose permanent residence is in Kitsap County, Washington.

10.     Defendant Scott Strother is employed by Defendant RU and works in Newark, New Jersey.  Upon information and belief, Defendant Strother is a resident of Essex County, New Jersey. He is hereby sued in both his personal and professional capacity.

---

[1] Contemporaneously with the filing of this Complaint, Plaintiff has filed a Motion Seeking Leave to Proceed Under Pseudonym with Exhibit A – counsel's affidavit containing Ms. Doe's personal identifying information – and a Motion Seeking a Protective Order Sealing a Portion of the Record, specifically Exhibit A.

11.     Defendant RU is a State University of New Jersey, and the relevant campus to this action is RU-Newark in Newark, New Jersey.

## FACTUAL ALLEGATIONS

### *Defendant RU's Consortium with NJIT*

12.     At all times relevant, NJIT and RU-Newark had a consortium relationship that allowed their students to access educational opportunities and benefits on each other's campuses.

13.     Defendant RU advertised the consortium relationship on its website: "Adjacent to the Newark campus of Rutgers is New Jersey Institute of Technology (NJIT) . . . Rutgers-Newark and NJIT enjoy an *exceptionally close and productive consortial relationship* . . . . Each year the two universities co-sponsor a common season of theatrical productions, a joint program of honors colloquia, and a variety of other cultural and social activities.  Rutgers-Newark students have library privileges at the Robert W. Van Houten Library of NJIT.  They also may enrich their educational experiences by enrolling in NJIT courses in areas not offered at Rutgers-Newark.  NJIT courses are cross-linked to the Rutgers-Newark online schedule in order to facilitate the cross-registration process.  Joint or cooperative degree programs now exist in several graduate and undergraduate fields . . . . *As a result of this consortial relationship, the opportunities available to students at both schools are greatly enhanced*."  (Emphasis added).[2]

### *Policies Issued by Defendant RU Pursuant to Title IX and the Clery Act*

14.     On October 14, 2015, Defendant RU adopted University Policy 10.3.12, entitled "Student Policy Prohibiting Sexual harassment, Sexual Violence, Relationship Violence, Stalking, and Related Misconduct" (hereinafter "RU Policy 10.3.12"). [3]

---

[2] *See* http://catalogs.rutgers.edu/generated/nwk-ug_0608/pg23449.html#:~:text=Adjacent%20to%20the %20Newark%20campus,University%20Heights%20section%20of%20Newark (last visited July 15, 2021).
[3] On December 17, 2019, Defendant RU revised RU Policy 10.3.12 without substantive revisions except for adding a sanction guide.  Upon information and belief, RU Policy 10.3.12 remained in effect during the 2020-2021 school year.

15.     Upon information and belief, Defendant RU intended for this RU Policy 10.3.12 to satisfy, at least in part, its obligations to publish a non-discrimination notice under Title IX and campus safety policies and procedures under the Clery Act.

16.     According to RU Policy 10.3.12, under the section "Complaints Against Faculty, Staff, & Third Parties," Defendant RU stated it would address sexual misconduct committed by any "third party . . . *otherwise affiliated with the University, but not a University student*." *Id.* at 4 (emphasis added).  It went on to state that when a perpetrator is a "party affiliated or doing business with the University," Defendant RU will ensure student-victims "receive all the rights and protections set forth in this Policy, to the extent applicable." *Id.*

17.     According to RU Policy 10.3.12, under the section "Unknown/Non-University Offenders," Defendant RU stated that it "will investigate reports of incidents *affecting university students that are committed by individuals who are not members of the University community* or whose identity is not known to the extent it is able." *Id.* at 11 (emphasis added).  In such a case, it also stated that it would "take appropriate actions designed to protect affected students . . . in the University community, and to remediate the impact of the incident on the Complainant/victim." *Id.*

18.     According to RU Policy 10.3.12: "Nothing in the Policy shall affect the inherent authority of Rutgers to take such action as it deems appropriate to further the educational mission or to protect the safety and security of the University community."  *Id.* at 24.  Upon information and belief, such inherent authority is derived from N.J.S.A. 18A:65–33.1, which states that Defendant RU has "care, custody and control" over its physical campus and buildings.

19.     According to its website, Defendant RU had authority to issue interim suspensions to ban potentially dangerous students from accessing RU's campus, such as through the issuance of a no-trespass order, which the RU Police Department (RUPD) would enforce through arrest.

20.     Regarding sexual violence complaints against third parties, RU Policy 10.3.12 cited the governing policies as University Policy 60.1.12, entitled "Policy Prohibiting Discrimination and Harassment" (hereinafter "RU Policy 60.1.12"), and an unnumbered policy entitled "Prohibiting Discrimination and Harassment, and Discrimination and Harassment Complaint Process for Complaints against University Employees and Individuals Who Do Business with the University." The latter stated that any campus official receiving a "verbal and written reports of . . . sexual misconduct" had to forward the same to Defendant RU's Office of Employment Equity (OEE).

21.     Upon information and belief, Defendant RU intended for RU Policy 60.1.12 and the related unnumbered policy to satisfy, at least in part, its obligations to publish a non-discrimination notice under Title IX and campus safety policies and procedures under the Clery Act.

22.     On July 5, 2016, Defendant RU adopted University Policy 60.1.28, entitled "Policy Prohibiting Sexual harassment, Sexual Violence, Relationship Violence, Stalking, and Related Misconduct by Employees and Third Parties" (hereinafter "RU Policy 60.1.28").

23.     Upon information and belief, Defendant RU intended for RU Policy 10.3.12 to satisfy, at least in part, its obligations to publish a non-discrimination notice under Title IX and campus safety policies and procedures under the Clery Act.

24.     According to RU Policy 60.1.28, Defendant RU addresses sexual misconduct committed by third parties when (i) occurring on campus, (ii) creating a hostile environment for an RU student; or (iii) involve an RU student and arise out of the "third party's business or relationship with the University." *Id*. at 3. It also stated that: "Once a report is made, the Title IX Coordinator

will work with the alleged victim . . . to determine how to respond to the report in a way that will stop and prevent recurrence of the alleged misconduct and provide remediation to the victim." *Id*.

25.     According to RU Policy 60.1.28, under the section "Unknown/Non-University Offenders," Defendant RU again pledged to "investigate reports of incidents affecting University employees or *students that are committed by individuals who are not members of the University community or whose identity is not known to the extent it is able*." *Id*. at 9 (emphasis added).  In such a case, it also stated that Defendant RU would "take appropriate actions designed to protect affected students . . . in the University community, and to remediate the impact of the incident for the Complainant/victim." *Id*.  Defendant RU also stated that it would make "every effort . . . to conclude the investigative process within 60 calendar days" with extensions for "good cause . . . in writing to both the Complainant and the Respondent simultaneously, along with a new timeline and explanation for the reason for the extension of time." *Id*. at 11.

26.     According to RU Policy 60.1.28, Defendant RU stated it would provide "interim remedial measures" to "mitigate the effects of the alleged prohibited conduct, prevent its recurrence, and make accommodations for the Complainants involved," including taking "protective measures to separate the Respondent from the community, if appropriate." *Id*. at 9–10.  Such measures "may be taken in the immediate aftermath of an incident and/or while an investigation or a disciplinary action is pending." *Id*. at 10.  Defendant RU also pledged that "every reasonable effort will be made to allow the Complainant to continue in his or her academic, University housing, and/or University employment arrangements." *Id*.

27.     For the 2019-2020 school year, Defendant RU issued a 144-page Annual Security Report containing its campus safety and security policies and procedures (hereinafter the "2019 ASR").  According to the 2019 ASR, upon a sexual assault report, Defendant RU will respond with

a "prompt, fair and impartial proceeding," which would be "[c]ompleted within reasonably prompt timeframes" with "extensions of timeframe for good cause with written notice . . . of the delay and the reason for the delay." *Id.* at 34, 35. Defendant RU pledged to resolve "every report under this Policy within sixty (60) calendar days of an initial report, not counting any appeal." *Id.* at 36.

28.     According to the 2019 ASR, Defendant RU stated that the accuser and accused had the right to "timely and equal access" to "information that will be used during . . . formal disciplinary meetings and hearings," including the investigative report." *Id.* It also stated that the parties had the right to "hear and respond to all information present against them." *Id.* For sexual assaults, Defendant RU would resolve complaints by hearing, *id.* at 37–38, and potentially issue a campus bans as a possible sanction, *id.* at 41.

29.     According to the 2019 ASR, Defendant RU would issue interim measures "in the immediate aftermath of an incident and/or while an investigation or a disciplinary action is pending." *Id.* at 37. In the 2019 ASR, Defendant RU defined interim measures as "appropriate steps designed to mitigate the effects" of sexual assault, which includes "protective measures," as issued by the Title IX Coordinator. *Id.*

30.     Pursuant to the Clery Act – the federal campus safety law requiring federal funding recipients like Defendant RU to issue annual security reports containing campus safety and security policies and procedures – recipients must provide reasonable accommodation, including protective measures, upon a victim's request. 20 U.S.C. § 1092(f)(8)(B)(vii); 34 C.F.R. § 668.46(b)(11)(v).

31.     According to RU Policy 10.3.12 and the 2019 ASR, both citing to the New Jersey Campus Sexual Assault Victim's Bill of Rights, a student suffering from an on-campus rape has the "right to require campus personnel to take reasonable and necessary action to prevent further unwanted contact of victims by their alleged assailants." N.J.S.A. 18A:61E–2. Such personnel may

become liable for damages upon "reckless disregard for the duties imposed by the act," which goes on to deny officials immunity for willful, wanton, or gross negligence. *See* N.J.S.A. 18A:61E–6.

32.     On August 14, 2020, Defendant RU revised RU Policy 60.1.12 to state that sexual misconduct committed by third parties "may be covered by" that policy or a new policy, University Policy 60.1.33, entitled "Title IX Policy and Grievance Procedures" (hereinafter "RU Policy 60.1.33), which it had adopted to ensure compliance with the U.S. Department of Education's amendments to Title IX regulation on sexual harassment procedures. *Id.* at 4–5.

33.     According to the revised RU Policy 60.1.12, when sexual misconduct complaints against third parties did not fall under RU Policy 60.1.33, they would be governed by an unnumbered policy entitled "Prohibiting Discrimination and Harassment, and Discrimination and Harassment Complaint Process for Complaints against University Employees and Third Parties." *Id.* at 5.

*NJIT Student T.D. Rapes Ms. Doe on Defendant RU's Campus*

34.     During the 2019–2020 school year, Ms. Doe was an enrolled freshman student attending RU-Newark and studying neuroscience and chemistry due to her ambition to attend medical school upon graduation. As a qualified student with a disability of Psychogenic Nonepileptic Seizure Disorder, Ms. Doe took medications daily to manage her condition.

35.     In November 2019, Ms. Doe met a NJIT student, A.N., while out at a party. The two agreed to exchange Snapchat information and became good friends who spoke daily.

36.     On March 5, 2020, A.N. invited Ms. Doe to attend a party at his fraternity, Alpha Mu Chapter of the Sigma Pi Fraternity, which is located on NJIT's campus.

37.     During this party, T.D. and other fraternity members served alcohol to the underage partygoers, who were students of both RU-Newark and NJIT.

38.     While at this party, Ms. Doe drank a significant amount of alcohol while on a new prescription medication, Klonopin,[4] which resulted in her quick intoxication after only a few drinks.

39.     A.N. noticed that Ms. Doe was slurring words and acting really "goofy," "rowdy," "over the top social," and that she was the "worst I've seen her" in reference to her intoxication level the night of the party.  At the suggestion of another concerned fraternity member who noticed that Ms. Doe was having trouble walking, A.N. safely escorted her back to the Talbott Apartments on RU's campus, which was only one block away from Sigma Pi.

40.     Prior to doing so, A.N. had informed Ms. Doe that a fraternity member unknown to her, T.D., was an NJIT student and "inactive" fraternity member.  Ms. Doe briefly met and spoke to T.D., and the two agreed to exchange Snapchat information to stay in touch.

41.     Later that night, via Snapchat, T.D. invited himself over to visit Ms. Doe.

42.     At all times relevant, Defendant RU owned and operated Talbott Apartments as an on-campus residence hall for enrolled students, like Ms. Doe.  Through its 2019 ASR, under the section "Residence Hall Security," Defendant RU issued campus safety and security policies and procedures governing residence halls visitors and guests.  *Id*. at 21–22.

43.     Despite Ms. Doe's obvious intoxication, an unidentified employee of Defendant RU working at Talbott Apartments residence hall allowed T.D. to sign-in as a guest sometime after 2 a.m.

44.     Shortly after entering her dorm room, T.D. proceeded to rape Ms. Doe.  Due to incapacitation, which had been caused by the alcohol mixing with her prescription medication, Ms. Doe found herself unable to physically resist this attack despite her best efforts, which included scratching him.  She also repeatedly verbally resisted during the attack until it became clear that T.D. would continue raping her regardless of her pleas for him to stop.

---

[4]  *See*  https://americanaddictioncenters.org/alcoholism-treatment/mixing-klonopin (mixing alcohol and Klonopin can "impair judgment and assessment of risk, as well as . . . temporary amnesia and extreme fatigue").

*Defendant RU Received Actual Notice About the On-Campus Rape*

45.     Later that same day, on March 6, 2020, Ms. Doe met with RU-Newark's CARE Coordinator, Anwaar Najmi and disclosed that an NJIT student had raped her in a residence hall. Coordinator Najmi directed Ms. Doe to RU-Newark's Violence Prevention and Victim Assistance (VPVA) Office, which is where Ms. Doe reported the rape again to VPVA Director Christie Howley.

46.     Director Howley attempted to discourage Ms. Doe from disclosing the rape to her parents.  Director Howley also encouraged Ms. Doe to report the on-campus rape to RUPD rather than RU-Newark's Title IX Office, which she found odd.

47.     On March 8, 2020, Ms. Doe underwent a forensic examination and reported the on-campus rape to RUPD.  The resulting criminal case is currently awaiting a prosecutorial decision.

48.     Due to the rape, Ms. Doe started sleeping over at a friend's dorm room in Woodward Hall until March 11, 2020, which is when she left RU-Newark's campus to be with family for support. Due to the COVID-19 pandemic, Ms. Doe had to return to campus to obtain her belongs from Talbott Apartments before flying home to finish her Spring 2020 semester classes virtually.

*Defendant RU Demonstrates Ongoing Deliberate Indifference to the On-Campus Rape*

49.     On March 9, 2020, Defendant Strother provided Ms. Doe a single-page letter stating that, as an RU student, she could "file a formal complaint regarding this incident through the University's Title IX process, which includes a prompt, thorough and impartial investigation of the incident."  Attached to this letter, Defendant Strother also provided 46-pages of additional materials that included RU Policy 10.3.12, but he did not attach any other applicable RU policies.

50.     On March 16, 2020, Ms. Doe followed up with Defendant Strother by email to pursue a formal Title IX complaint regarding the on-campus rape committed by T.D.

51.     Title IX regulation has long required federal funding recipients, like Defendant RU, to provide students, like Ms. Doe, with a "prompt and equitable" grievance process to investigate and resolve sexual assault complaints.  34 C.F.R. § 106.8(b) (1974); 34 C.F.R. § 106.8(c) (2020).

52.     According to Title IX guidance then-in-effect, the U.S. Department of Education's Office for Civil Rights (OCR) explicitly required Title IX grievance procedures to address complaints against third parties. *See* U.S. DEP'T OF EDUC., OCR, REVISED SEXUAL HARASSMENT GUIDANCE: HARASSMENT OF STUDENTS BY SCHOOL EMPLOYEES, OTHER STUDENTS, OR THIRD PARTIES (2001).[5]

53.     While Defendant Strother responded to confirm that Defendant RU had jurisdiction over "parties *affiliated* with Rutgers University," he claimed that Defendant RU lacked jurisdiction over complaint involving "a student from another university," such as NJIT.  Defendant Strother also claimed that Defendant RU could only share the rape complaint with NJIT's Title IX Coordinator, who would take "whatever action they deem necessary under *their respective Title IX Policy*."  This implied that Defendant RU's policies and procedures did not apply.

54.     Upon information and belief, due to the consortial relationship between RU-Newark and NJIT, T.D. had an "affiliation" with Defendant RU despite being an NJIT student because the consortium allowed him ongoing access to educational benefits and opportunities on RU's campus.

55.     On March 17, 2020, Ms. Doe replied to Defendant Strother that she would still like to proceed with a formal complaint against T.D.  On March 30, 2020, Defendant Strother interviewed Ms. Doe about her complaint.  During this interview, she identified A.N. as a key witness to the rape complaint.

56.     Defendant Strother finalized the complaint in writing on April 2, 2020.  That same day, Defendant Strother sent the complaint to NJIT.

---

[5] *See* https://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf (last visited September 27, 2021).

57.     Upon information and belief, following the submission of this rape complaint to NJIT, Defendants failed to independently investigate and resolve Ms. Doe's rape complaint against T.D. pursuant to the 2019 ASR, RU Policy 10.3.12, or RU Policy 60.1.12.

58.     Despite claiming it would investigate Ms. Doe's complaint under Title IX, and interviewing her twice, on July 6, 2020, NJIT, by and through its general counsel, abruptly dismissed Ms. Doe's complaint as falling outside the institutions obligations under Title IX.

*Defendant RU Delays the Title IX Grievance Process &*
*Refuses to Issue Protective Measures to Remedy to the Hostile Environment*

59.     After this abrupt turn of events, on July 7, 2020, Ms. Doe's advisor for the Title IX grievance process emailed Defendants to demand they investigate and resolve the rape complaint against T.D. under Title IX.

60.     Ms. Doe's advisor also requested that Defendants issue an interim protective measure, such as a no-trespass order, to prevent T.D., who was not an RU student, from entering RU's campus during the Fall 2020 semester because Ms. Doe planned to return and feared running into him.

61.     On July 9, 2020, Defendant Strother spoke with Ms. Doe and her advisor via phone about the Title IX grievance process and requested protective measures.  Notably, Defendant Strother agreed at that time to initiate the grievance process regarding Ms. Doe's rape complaint against T.D. without further objections regarding any lack of jurisdiction by Defendant RU.  Thus, after delaying 125 days after its actual notice of the rape, and 115 days after Ms. Doe told Defendant Strother that she wanted to proceed with a formal complaint against T.D., Defendant RU finally initiated its Title IX grievance process to address the on-campus rape.

62.     Regarding the protective measures request, Defendant Strother stated that he did not know whether Defendant RU or RUPD could issue a no-trespass order, so he agreed by phone and subsequent email exchanges to obtain that information before Ms. Doe returned to campus.

63.     Thereafter, on August 3, 2020, August 12, 2020, and August 14, 2020, Ms. Doe's advisor followed up with Defendant Strother about whether Defendant RU or RUPD could issue a no-trespass order to ban T.D. from Ru's campus as a protective measure without any response back.

64.     Due to Defendant RU's failure to issue any protective measures, Ms. Doe arranged to live off-campus at an increased cost.

65.     On August 17, 2020, four days before Ms. Doe's scheduled return to RU's campus, Defendant Strother claimed that Defendant RU had to delay the Title IX investigation until T.D.'s attorney made him available for an interview.  Defendant Strother also claimed that RUPD refused to issue a no-trespass order against T.D. absent criminal charges.

66.     Ms. Doe's advisor responded that neither the Clery Act nor Title IX authorized Defendants to delay the grievance process because of T.D.'s refusal to participate.  Ms. Doe's advisor requested a copy of any policies by Defendant RU or RUPD governing the issuance of no-trespass orders and asked if such an order could be issued as part of the Title IX process (rather than as part of the criminal process).  Again, Defendant Strother did not respond back.

67.     On August 21, 2020, when Ms. Doe returned to campus, her advisor followed up again with Defendant Strother by email to demand a timeline for the ongoing Title IX grievance process and to, once again, request a copy of any policies governing no-trespass orders.

68.     Unbeknownst to Ms. Doe or her advisor, on August 25, 2020, T.D. submitted a statement to Defendant RU as part of the Title IX grievance process.

69.     That same day, Defendant Strother replied to Ms. Doe and her advisor claiming the grievance process would be completed "as soon as possible" and the request for policies about the issuance of a no-trespass order had been forwarded to general counsel for Defendant RU.

70.     On August 26, 2020, after several email exchanges with Ms. Doe's advisor, Defendant Strother committed to completing the ongoing Title IX investigation by the week of September 7th or September 14th at the latest.  However, it was not until September 9, 2020, that Defendant RU's Title IX investigator, Alicia Ponce, first reached out to Ms. Doe about the ongoing grievance process.

71.     On September 15, 2020, Ms. Doe's advisor informed Defendant Strother that Defendant RU's general counsel had never reached out or provided any no-trespass order policies. Defendant Strother responded that Defendant RU did not have any such policy and instead left the issuance of a campus ban up to RUPD without specifying any criteria that would be used.

72.     According to RU Policy 10.3.12, Defendant RU is authorized to issue campus bans as a remedy for Title IX violations.  *Id*. at 23.  In fact, as a Title IX Coordinator for Defendant RU, Defendant Strother had authority to issue such remedies even if unlisted in the policy.

73.     On September 28, 2020, after Defendant RU missed its own deadline for completing the Title IX grievance process without any good cause reason for an extension being provided to Ms. Doe, her advisor reached out to various RU officials to obtain an updated timeline.  Investigator Ponce responded that Defendant RU would conclude the Title IX investigation in less than a month by specifying it would be completed no later than October 16, 2020.

74.     On October 12, 2020, as memorialized in an email exchanged between Ms. Doe's advisor and Defendant RU's general counsel, Defendant RU confirmed that it would soon conclude the Title IX investigation and that RUPD would consider issuing a no-trespass order against T.D. based upon the investigative findings.

75.     On October 14, 2020, general counsel for Defendant RU claimed in an email to Ms. Doe's advisor that it had been limited in its ability to ban a third-party respondent from RU's campus "based on allegations alone and in the absence of findings against the respondent," thus seemingly

acknowledging that Defendant RU's own delayed grievance process is the reason it had denied Ms. Doe available protective measures that would have allowed her to safely return to RU's campus.

76.     On October 16, 2020, Defendants failed to provide any notice to Ms. Doe or her advisor that they had completed the Title IX investigation.

77.     On October 27, 2020, Investigator Ponce stated that Defendant Strother had received the final investigative report regarding Ms. Doe's complaint.

78.     On November 1, 2020, and November 11, 2020, Ms. Doe's advisor asked Defendants when the final Title IX investigative report and outcome would be provided to Ms. Doe without any response back from either Investigator Ponce or Defendant Strother until December 7, 2020.

*Defendant RU's Ongoing Delayed Title IX Grievance Process*

79.     On December 7, 2020, Defendant Strother claimed that he would make a Title IX determination based off the now "finalized" investigative report within "the next few days." However, he never provided a determination, even after Ms. Doe's advisor followed up on December 14, 2020.

80.     On December 22, 2020, Defendant Strother responded that instead of RU Policy 10.3.12 applying to the ongoing Title IX grievance process, Defendant RU would now be following RU Policy 60.1.28 and an unnumbered policy entitled "Discrimination, Harassment, Workplace Violence, Sexual Misconduct and Retaliation Complaint Process: Complaints against University Employee and Third Parties."  Defendant Strother stated that the Director of the OEE would now make the determination regarding Ms. Doe's rape complaint against T.D.

81.     Based on this information, Defendant RU apparently did not follow the proper policy until 291 days after Defendant RU received actual notice of the on-campus rape, until 281 days after

Ms. Doe indicated she wanted to pursue a formal complaint against T.D., and not until 166 days after Defendant Strother agreed that Defendant RU would initiate its Title IX grievance process.

82.    On December 31, 2020, and January 26, 2021, Ms. Doe's advisor followed up again with Defendants about any Title IX determination.

83.    On January 28, 2021, Defendant Strother responded without providing a timeline or any good cause reason for the ongoing delay regarding the ongoing Title IX grievance process.  That same day, Ms. Doe's advisor demanded that Defendants provide a timeframe for resolution. Defendant Strother did not respond until February 4, 2021, when he again failed to provide any timeline or good cause reason for the ongoing delay of Defendant RU's Title IX grievance process.

84.    Counter to Defendants' claims that they had completed the Title IX investigation, A.N. informed Ms. Doe and her advisor that Defendant Strother had not sought to interview him until January 8, 2021, which is 308 days after Defendant RU received actual notice of the on-campus rape, 298 days after Ms. Doe indicated she wanted to pursue a formal complaint against T.D., and 183 days after Defendant Strother agreed that Defendant RU would initiate its Title IX grievance process.

85.    Defendant RU did not conduct an interview of A.N. until January 19, 2021.

*Defendant RU Refuses to Remedy the Hostile Environment After Finding T.D. Responsible*

86.    On February 1, 2021, due to Defendants repeatedly refusing to provide any anticipated timeframes for the conclusion of the Title IX grievance process, Ms. Doe filed a Title IX complaint against Defendant RU with the U.S. Department of Education (OCR Case No. 02-21-2064).

87.    Upon information and belief, on or about February 23, 2021, the U.S. Department of Education's OCR provided Defendant RU notice of this Title IX complaint.

88.    Two days later, on February 25, 2021, Defendant RU issued a determination letter that found T.D. responsible for the on-campus rape.  Defendant RU also provided Ms. Doe and her advisor

the 125-page Title IX investigative report by Defendant Strother, which was dated October 16, 2020 (despite the investigation lasting through January 2021), along with a copy of RU Policy 60.1.33.

89.     Despite finding T.D. responsible, Defendant RU still refused to issue any corrective action, such as a no-trespass order, to prohibit his ongoing access to RU's campus.

90.     On February 25, 2021, February 26, 2021, March 7, 2021, and March 10, 2021, Ms. Doe's advisor asked Defendant RU when corrective action would be taken without any response back despite copying Defendant Strother, Investigator Ponce, the OEE Director, and RU's general counsel.

91.     At some point, without Defendant RU providing any notice to Ms. Doe, T.D. filed an appeal challenging the determination.  Ms. Doe only learned about the appeal on March 15, 2021, after her advisor asked Defendant RU for the *fifth time* whether it had issued any corrective action. Despite a request from Ms. Doe's advisor, Defendants refused to provide Ms. Doe with a copy of the appeal so that she could respond to T.D.'s arguments during the Title IX grievance process.

92.     While Ms. Doe waited for the final appeal outcome, she resolved to transfer out of RU to attend another university across the country to ensure her ongoing safety and wellbeing due to the lack of any corrective action taken by Defendants to date.

93.     Over a month later, on April 1, 2021, Defendant RU denied T.D.'s appeal.  In this decision, Defendant RU cited only a portion of T.D.'s appeal to indicate that even he and his advisor were confused about what, if any, corrective action would result from the grievance process.

94.     Following this outcome, Ms. Doe's advisor asked Defendant RU whether it would issue any corrective action against T.D., such a no-trespass order, without any response back.  Upon information and belief, Defendant RU never issued any corrective action against T.D.

95.     Pursuant to the unnumbered policy entitled "Discrimination, Harassment, Workplace Violence, Sexual Misconduct and Retaliation Complaint Process: Complaints against University

Employee and Third Parties," which Defendant Strother flagged as applicable to Ms. Doe and her advisor back on December 22, 2020, Defendant RU is supposed to notify a complainant of corrective action taken against a respondent when it "involves or concerns the complainant." *Id*. at 5. Notably, this unnumbered policy only listed sanctions against employees, not for third parties. *Id*.

96.     All in all, Defendants took *over a full calendar year* to complete the Title IX grievance process against T.D. on April 1, 2021, which is 391 days after RU received actual notice of the on-campus rape, 381 days after Ms. Doe indicated she wanted to pursue a formal complaint against T.D., and 266 days after agreeing to proceed with RU's Title IX grievance process.

*Ms. Doe Suffered and Continues to Suffer Damages Due to Defendants' Malfeasance*

97.     Throughout the 2020-2021 school year, Ms. Doe suffered constant fear whenever she accessed RU's campus since T.D. could also access it at any time. Due to the COVID 19 pandemic, Ms. Doe felt unable to potentially identify T.D. with a mask on, which led her to constantly fear that any similar looking male nearby might be him. As such, Ms. Doe repeatedly suffered panic attacks, crippling anxiety, suicidality, and ongoing emotional distress.

98.     Despite Ms. Doe being entitled to access educational opportunities and benefits on NJIT's campus due to the consortium relationship between RU-Newark and NJIT, she stopped accessing NJIT's campus altogether to avoid the possibility of coming into proximity with T.D.

99.     Due to the repeatedly delayed Title IX grievance process, and unresolved concern about potential campus safety issues absent a protective order, Defendant RU effectively denied Ms. Doe equal access to education on RU's campus.

100.     To ensure her own safety, well-being, and equal access to higher education, Ms. Doe moved out of state and transferred universities after the Spring 2021 semester. At additional cost, to

mitigate her potential economic and academic-related damages, Ms. Doe has taken additional courses during the Summer 2021 semester to maintain her originally anticipated graduation date.

## CLAIMS FOR RELIEF

### COUNT I
*(Deliberate Indifference in Violation of Title IX, 20 U.S.C. §§ 1681, et seq., against Defendant RU)*

101.    Plaintiff hereby incorporates by reference the allegations of fact contained in the previous paragraphs as if fully set forth herein.

102.    Defendant RU is a recipient of federal funding subject to Title IX.

103.    T.D. was "affiliated" with Defendant RU through the consortium with NJIT.

104.    On March 6, 2020, Defendant RU exercised substantial control over T.D. when he entered RU's campus and registered as a guest in the Talbott Apartments residence hall.

105.    T.D.'s on-campus rape of Ms. Doe is sufficiently severe to constitute actionable sexual harassment, which is a prohibited form of sex discrimination under Title IX.

106.    Defendant RU exercised substantial control over the context of the on-campus rape, which occurred in the Talbott Apartments residence hall.

107.    The resulting hostile environment from T.D.'s rape is so pervasive as to impede Ms. Doe's equal access to education.

108.    Ms. Doe provided Defendant RU with actual notice of the rape on March 6, 2020.

109.    Despite actual notice, Defendant RU demonstrated its deliberate indifference towards the on-campus rape through the following:

   a.   VPVA Director Howley discouraging Ms. Doe from reporting the rape to her parents.

   b.   VPVA Director Howley encouraging Ms. Doe to report the rape to RUPD but not RU-Newark's Title IX Office to trigger Defendant RU's obligations under Title IX.

c.  Defendant RU and RUPD failing to preserve crucial security camera footage from Talbott Apartments on March 6, 2020.

d.  Defendant RU, by and through Defendant Strother, refusing to allow Ms. Doe to file and proceed with a formal complaint of rape against T.D. through Defendant RU's Title IX grievance process on March 16, 2020.

e.  On March 16, 2020, Defendant RU claimed that NJIT would proceed with Ms. Doe's formal Title IX complaint against T.D., which NJIT declined to do on July 6, 2020.

f.  On July 9, 2020, Defendant RU agreed to initiate its Title IX grievance process against T.D. to resolve Ms. Doe's rape complaint (as it should have done in the first place); however, it did not issue a final investigative report to Ms. Doe until February 25, 2021, which is 231 days later.

g.  On August 21, 2020, Defendant RU claimed it could not proceed with the Title IX investigation unless T.D. agreed to participate in the process through providing an interview, which is not a requirement under Title IX or RU's policies and procedures.

h.  Defendant RU repeatedly delayed the Title IX grievance process after receiving actual notice of the on-campus rape on March 6, 2020, until issuing the final appeal outcome on April 1, 2021, which is 391 days later.

i.  During this over year long period, Defendant RU repeatedly refused to issue any protective measure that would keep NJIT student T.D. away from Ms. Doe while on RU's campus, such as a no-trespass order.

j.  Defendant RU also repeatedly failed to keep any promised timeline for completing the Title IX grievance process, and never provided a good cause reason in writing for the

ongoing delay, as required by Title IX, the Clery Act, and RU's policies and procedures.

k.  In fact, after the Fall 2020 semester, Defendant RU outright refused to provide Ms. Doe and her advisor with any new timeframes for its completion of the Title IX grievance process as required by Title IX, the Clery Act, and RU's policies and procedures.

l.  Defendant RU and its officials often went weeks without providing Ms. Doe or her advisor information requested about the ongoing Title IX grievance process to demonstrate its conscious disregard of the impact of its unclear process on Ms. Doe.

m.  On December 22, 2020, Defendant RU, by and through Defendant Strother, declared that it had been using the wrong policy to investigate and resolve Ms. Doe's rape complaint against T.D. to cause further delays without responsive communication about how the newly applied policy would affect the timeline.

n.  While Defendant RU claimed that it had concluded the Title IX investigation into Ms. Doe's rape complaint on October 16, 2020, it did not reach out to interview Ms. Doe's only key witness, A.N., until January 16, 2021.

o.  Defendant RU did not issue any determination in Ms. Doe's rape complaint until February 23, 2021, which is two days after OCR notified it of Ms. Doe's Title IX complaint pending against it with the U.S. Department of Education.

p.  Despite T.D. appealing the determination, Defendant RU did not provide Ms. Doe notice upon receipt of his appeal, a copy of his appeal, or an opportunity to respond to the appeal despite its obligation under Title IX to provide an equitable process, and under the Clery Act to provide all information relied upon by Defendant RU.

q.  Upon information and belief, despite finding T.D. responsible for the on-campus rape on February 25, 2021, and upholding that decision on April 1, 2021, Defendant RU did not issue any corrective action despite Ms. Doe's advisor repeated requests for the same.

110.   By and through this deliberate indifference, Defendant RU left Ms. Doe vulnerable to possible ongoing harassment and stalking by NJIT student T.D. on RU's campus due to its refusal to remedy the hostile environment through the issuance of any protective measures, such as a no-trespass order.

111.   Due to Ms. Doe's ongoing fear of running into T.D. on RU's campus, and Defendant RU's ongoing deliberate indifference, she suffered and continues to suffer concrete negative effects and damages, including but not limited to missed classes, ongoing emotional distress, transferring schools, and moving across country twice, once after the rape and the second time after she transferred schools.

112.   As a direct and proximate result of Defendant RU's unlawful discrimination, by and through its employees, Ms. Doe sustained and continues to sustain injuries for which she is entitled to be compensated, including but not limited to:

a.  Past, present, and future physical and psychological pain, suffering, and impairment;

b.  Medical and counseling bills, and all other costs and expenses for past, present, and future medical and psychological care;

c.  Loss of educational access and opportunity;

d.  Past, present, and future economic losses, including lost wages and benefits;

e.  Attorneys' fees and costs; and

f.  Such other and further release that this Court deems just and proper.

## COUNT II
(*Sex Discrimination in Violation of Title IX, 20 U.S.C. §§ 1681,* et seq*., against Defendant RU*)

113.    Plaintiff hereby incorporates by reference the allegations of fact contained in the previous paragraphs as if fully set forth herein.

114.    Since 1972, the plain, statutory language of Title IX obligates Defendant RU to address sexual harassment and violence committed by third parties impacting the educational access of its own students.  20 U.S.C. § 1681(a) (prohibiting recipients from allowing conduct that subjects persons seeking educational access to discrimination).

115.    Since 2001, the U.S. Department of Education's OCR has further emphasized to federal funding recipients like Defendant RU that they are obligated to address on-campus sexual harassment and violence by third parties when such misconduct impacts RU students' educational access.  *See* U.S. DEP'T OF EDUC., OCR, REVISED SEXUAL HARASSMENT GUIDANCE: HARASSMENT OF STUDENTS BY SCHOOL EMPLOYEES, OTHER STUDENTS, AND THIRD PARTIES (2001).

116.    Despite stating in its own written policies and procedures that it would investigate and resolve third party sexual misconduct occurring on RU's campus against RU students, Defendant RU intentionally discriminated against Ms. Doe by refusing to allow her to proceed with a formal complaint against T.D. through its Title IX grievance process from March 16, 2020, until July 9, 2020, which represents a 115-day delay.

117.    Thereafter, Defendant RU continually discriminated against Ms. Doe by refusing to provide her reliable information about the ongoing Title IX investigation or timeframes for the completion of the grievance process which resulted in unexplained delays without any good cause reason provided from July 9, 2020, until February 25, 2020, which represents a 231-day delay.

118.   As a direct and proximate result of Defendant RU's unlawful discrimination, by and through its employees, Ms. Doe sustained and continues to sustain injuries for which she is entitled to be compensated, including but not limited to:

   a.   Past, present, and future physical and psychological pain, suffering, and impairment;

   b.   Medical and counseling bills, and all other costs and expenses for past, present, and future medical and psychological care;

   c.   Loss of educational access and opportunity;

   d.   Past, present, and future economic losses, including lost wages and benefits;

   e.   Attorneys' fees and costs; and

   f.   Such other and further release that this Court deems just and proper.

### COUNT III
*(Failure to Remedy a Hostile Environment in Violation of*
*Title IX, 20 U.S.C. §§ 1681,* et seq*., against Defendant RU*)

119.   Plaintiff hereby incorporates by reference the allegations of fact contained in the previous paragraphs as if fully set forth herein.

120.   Defendant RU's refusal to remedy the hostile environment through the issuance of protective measures, such as no-trespass order, left her vulnerable to the possibility of further harassment since T.D. could access RU's educational programs and activities through the consortium.

121.   Defendant RU's refusal to remedy the hostile educational environment demonstrates deliberate indifference towards the on-campus rape and sex-based discrimination towards Ms. Doe.

122.   As a direct and proximate result of Defendant RU's unlawful discrimination, by and through its employees, Ms. Doe sustained and continues to sustain injuries for which she is entitled to be compensated, including but not limited to:

   a.   Past, present, and future physical and psychological pain, suffering, and impairment;

   b.  Medical and counseling bills, and all other costs and expenses for past, present, and future medical and psychological care;

   c.  Loss of educational access and opportunity;

   d.  Past, present, and future economic losses, including lost wages and benefits;

   e.  Attorneys' fees and costs; and

   f.  Such other and further release that this Court deems just and proper.

## COUNT IV
*(Negligence in Violation of the NJTCA, N.J.S.A. 59:2,* et seq*., against Defendants)*

123.   Plaintiff hereby incorporates by reference the allegations of fact contained in the previous paragraphs as if fully set forth herein.

124.   On June 29, 2021, by and through counsel, Ms. Doe sent Defendant RU a timely notice of claims regarding its malfeasance and the malfeasance of Defendant Strother.

125.   Defendant Strother is a public employee of Defendant RU.

126.   By virtue of his position as a Title IX Coordinator for Defendant RU, Defendant Strother has a duty to ensure its Title IX compliance pursuant to 34 C.F.R. § 106.8.

127.   Both Defendants RU and Strother had a duty to remedy any hostile educational environment arising out of an on-campus rape occurring at RU-Newark; however, they both breached this duty by failing to initiate the Title IX grievance process, and by failing to issue any protective measures either in the interim or as a corrective action upon the final outcome of the process.

128.   As argued *supra*, the breach of these duties by Defendants caused Ms. Doe injury by denying her equal access to education on RU-Newark's campus and subjecting her to ongoing emotional distress whenever she accessed that campus.

129.   Defendant Strother is not entitled to qualified immunity because he acted in bad faith when he violated well-established federal civil rights under Title IX.

130.    As a direct and proximate result of Defendants' unlawful discrimination, Ms. Doe sustained and continues to sustain injuries for which she is entitled to be compensated, including but not limited to:

a.   Past, present, and future physical and psychological pain, suffering, and impairment;

b.   Medical and counseling bills, and all other costs and expenses for past, present, and future medical and psychological care;

c.   Loss of educational access and opportunity;

d.   Past, present, and future economic losses, including lost wages and benefits;

e.   Attorneys' fees and costs; and

f.   Such other and further release that this Court deems just and proper

## REQUEST FOR RELIEF

131.    WHEREFORE, Plaintiff respectfully requests that this Court grant her a jury trial seeking: (a) compensatory damages in an amount that exceeds $75,000, to be proven at trial; (b) reasonable attorneys' fees, costs, and expense; and (c) all other and further release that this Court deems just and proper.

## JURY DEMAND

132.    Plaintiff respectfully requests a trial by jury.

This 30th day of December 2021.                    Respectfully Submitted,

Laura L. Dunn, Esq. (*pro hac vice* pending)
L.L. DUNN LAW FIRM, PLLC
1717 K Street NW, Suite 900
Washington D.C. 20006
T: 202-302-4679
F: 202-776-0136
LDunn@lldunnlawfirm.com

Brian Kent (N.J. Bar No. #041892004)
Gaetano D'Andrea (*pro hac vice* pending)
LAFFEY BUCCI KENT, P.C.
1100 Ludlow Street, Suite 300
Philadelphia, PA  19107
T: 215-399-9255
F: 215-857-0075
BKent@laffeybuccikent.com
GDAndrea@laffeybuccikent.com

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
NEWARK DIVISION

| | |
|---|---|
| VERONICA DOE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **CERTIFICATE OF SERVICE** |
| ) | |
| RUTGERS UNIVERSITY, the State University ) | |
| of New Jersey, & SCOTT STROTHER, in his ) | |
| personal and official capacity, ) | |
| ) | |
| Defendants. ) | |

I hereby certify that on this day, I served the foregoing Civil Complaint on counsel of record

for the Defendants through the U.S. mail to:

Jennifer McGruther
Office of the Senior Vice President & General Counsel
Rutgers, The State University of New Jersey
Stanley S. Bergen Building
65 Bergen Street, Suite 1328
Newark, NJ 07107

This 30th day of December 2021.                    Respectfully Submitted,

Brian D. Kent (N.J. Bar No. #041892004)
LAFFEY BUCCI KENT, P.C.
1100 Ludlow Street, Suite 300
Philadelphia, PA  19107
T: 215-399-9255
F: 215-857-0075
Bkent@laffeybuccikent.com