<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| VERONICA DOE,<br><br>        Plaintiff,<br><br>        v.<br><br>RUTGERS UNIVERSITY and SCOTT STROTHER,<br><br>        Defendants. | No. 21cv20763 (EP) (MAH)<br><br>**OPINION** |

**PADIN**, **District Judge.**

Plaintiff Veronica Doe ("Ms. Doe") brings this action against Defendants Rutgers University, the State University of New Jersey ("Rutgers") and Doctor Scott C. Strother, Rutgers' Director of Title IX[1] ("Dr. Strother"), for their alleged deliberate indifference and negligence in connection with Ms. Doe's alleged sexual assault by a New Jersey Institute of Technology ("NJIT") student T.D. on March 6, 2020.  Presently before the Court are the parties' dueling motions for summary judgment.  D.E.s 107-1 ("Defendants' Motion" or "Defs. Mot."), 108-1 ("Plaintiff's Motion" or "Pl. Mot.").  The Court decides the matter without oral argument.  *See* Fed. R. Civ. P. 78; L. Civ. R. 78.1(b).  For the reasons below, the Court will **DENY** Ms. Doe's Motion and will **DENY in part** and **GRANT in part** Defendants' Motion.

## I.    BACKGROUND[2]

The statements of facts are not models of clarity, so the Court does its best to parse through the disputes, many of which abjure facts or raise record evidence that does not actually address the

---

[1] 20 U.S.C. § 1681(a).

[2] The facts are drawn from the parties' statements of material facts, affidavits, and exhibits:  D.E.s 107-2 ("Defs. Facts"); 108-2 ("Pl. Facts"); 107-10 ("Defs. Resp. Facts"); 110-2 ("Pl. Resp. Facts");

purported undisputed fact at issue.  By way of example, Rutgers states that on March 9, 2020, Dean Erica Williams forwarded a Rutgers University Police Department ("RUPD") e-mail to Rutgers' Title IX office and requested that Residence Life impose a ban barring T.D. at all residence halls.  Defs. Facts ¶ 18 (citing D.E. 107-3, Ex. 18 ("Maderer Decl.")).  Rutgers then indicates that the residence hall ban was issued the same day.  *Id.* ¶ 19 (citing Maderer Decl., Ex. 19).  Ms. Doe improperly attempts to dispute these facts by "clarif[ying]" that Rutgers failed to issue other sanctions and inform her that it issued the temporary residence hall ban.  Pl. Resp. Facts ¶ 18 (citing Pl. Facts ¶ 33 (citing D.E. 108-4, Ex. 5 to Ex. 7 ("Williams Tr.")).  Adding clarifying language or contextualizing a fact is not the same as disputing it with record evidence.  When either party attempts to eschew its obligations under L. Civ. R. 56.1(a) with such responses, the Court will deem the fact undisputed.

A.    **The Parties**

Rutgers is a federal funding recipient subject to Title IX.  Pl. Facts ¶ 1.  Dr. Strother was Rutgers' Title IX coordinator during the 2019-2020 school year.  *Id.* ¶ 13.  Ms. Doe was a student at Rutgers-Newark from the fall semester of 2019 through the spring semester of 2021.  Defs.

---

107-15 ("Defs. Reply Facts").  The Court disregards portions of the parties' statements of facts that do not properly cite to the record, contain improper legal arguments or conclusions, or recite factual irrelevancies.  *See* Fed. R. Civ. P. 56(1)(c)(1); L. Civ. R. 56.1(a); s*ee also Jones v. Sanko Steamship Co., Ltd.*, 148 F. Supp. 3d 374, 379 n.9 (D.N.J. 2015) (disregarding potions of statements that include legal arguments, lack of citations, or factual irrelevancies).  Undisputed facts are indicated by reference to only one party's statement of facts.  Contrary to Plaintiff's position, Fed. R. Civ. P. 8(b) does not govern.  Pl. Mot. at 1 n.1.  Hyperbolic language hurled at either party is also unpersuasive to the Court.  Lastly, the Court can disregard the numerous evidentiary objections raised only in the statements of facts and not in briefs.  *See Starland v. Fusari*, No. 10-4930, 2013 WL 12149123, at *1 n.1 (D.N.J. Nov. 15, 2013) ("[T]he Court will disregard legal arguments and conclusions of law contained within the Rule 56.1 statements and responses, including evidentiary objections to the Court's consideration of certain facts, as such objections should have been raised in the briefs.").

Facts ¶ 1.  T.D., Ms. Doe's assailant, was an NJIT student from fall 2018 through spring 2022.  *Id.* ¶ 3.

          i.      *The relationship between Rutgers and NJIT*

Through their consortium, Rutgers and NJIT offer joint degree programs, allow cross-registration of their students for certain courses, and occasionally host joint events.  Pl. Facts ¶¶ 5-8.  However, the record does not reflect any consortial relationship between the two schools as it pertains to Title IX.  Defs. Resp. Facts ¶ 5 (citing D.E. 108-4, Ex. 3, 46:19-48:12, 49:2-9 ("Gunkel Tr.")).

The parties dispute whether Rutgers can or does defer sexual misconduct cases involving third-party students to the offending student's educational institution.  Ms. Doe states that Rutgers had the authority to resolve third party misconduct cases, but defers to Title IX coordinators for the relevant campus.  Pl. Facts ¶ 12 (citing D.E. 108-5, 51:24-54:7 ("Dellatore Tr.")).  Defendants state that deference to another Title IX coordinator refers to the relevant Rutgers campus, not another educational institution.  Defs. Resp. Facts ¶ 12 (citing Dellatore Tr., 53:1-55:13).

**B.**    **Rutgers' Policies on Sexual Misconduct and General Security**

In 2015, Rutgers adopted Policy 10.3.12: the Student Policy Prohibiting Sexual Harassment, Sexual Violence, Relationship Violence, Stalking, and Related Misconduct.  Pl. Facts ¶ 32.  Policy 10.3.12 lists campus bans as available Title IX remedies.  *Id.* ¶ 33.  In 2016, Rutgers adopted Policy 60.1.28: Policy Prohibiting Sexual Harassment, Sexual Violence, Relationship Violence, Stalking, and Related Misconduct by Employees and Third Parties.  *Id.* ¶ 38.  Both policies proscribe the same conduct and use the same definitions, but Policy 10.3.12 applies to Rutgers students' sexual misconduct, while Policy 60.1.28 applies to third parties and employees' sexual misconduct.  Defs. Facts ¶¶ 84, 86.  In addition, Policy 10.3.12 is administered by the

Rutgers Office of Title IX and ADA Compliance, whereas Policy 60.1.28 is administered by the Rutgers OEE. *Id.* ¶ 87.

Policy 60.1.28 governed Ms. Doe's complaint because T.D. was third-party. *Id.* ¶ 85. It details that once a report is made, the Title IX Coordinator would work with the alleged victim and prescribed "interim remedial measures" including "protective measures . . . [that] separate the Respondent from the community," whether "in the immediate aftermath of an incident and/or while an investigation or a disciplinary action is pending." Pl. Facts ¶ 39. Policy 60.1.28 further states that Rutgers would make every effort to conclude the investigative process within 60 calendar days, with extensions for "good cause" and "in writing to both the Complainant and the Respondent simultaneously, along with a new timeline and explanation for the reason for the extension of time." *Id.* ¶ 41.

In addition, Rutgers had security policies in place for residence hall guests, requiring them to present identification to security while a Rutgers student escort was present for check-in and check-out. *Id.* ¶ 59.

### C.    March 6, 2020 and Initial Reporting

On the evening of Thursday, March 5, 2020, Ms. Doe attended a fraternity party on NJIT's campus, where she met T.D. Defs. Facts ¶ 2. Ms. Doe consumed alcohol that night. *Id.* At the time, Ms. Doe resided at Talbott Apartments, a Rutgers-Newark on-campus residence hall. *Id.* ¶ 5. She was walked home by A.N. Pl. Facts ¶ 80. At about 2:30 a.m. that night—now March 6, 2020—Ms. Doe signed T.D. in as her guest into Talbott Apartments. Defs. Facts ¶ 4. While in her dorm room, T.D. sexually assaulted Ms. Doe while she was too intoxicated to consent. Pl. Facts ¶ 83. Sometime around 4:00 a.m., Ms. Doe walked T.D. down to the security desk and signed him out of the residence hall. Defs. Facts ¶ 6.

4

That afternoon, Ms. Doe was scheduled to meet with Anwaar Najmi, a Rutgers Campus Awareness Response and Education ("CARE") Team coordinator to address a pre-existing seizure disorder. *Id.* ¶ 7. The CARE Team is meant to address student concerns. *Id.* ¶ 8 (citing D.E. 107-4, Ex. 6, 20:11-25, 32:6-33:23 ("Najmi Tr.")). Ms. Doe told Najmi she was sexually assaulted by T.D. earlier that morning in her dorm room. *Id.* ¶ 9. Rutgers failed to preserve video recording showing Ms. Doe and T.D. entering Talbott Apartments on the night in question. Pl. Facts ¶ 145.

Najmi walked Ms. Doe to the VPVA Office following their meeting and told VPVA Director Christine Howley about the reported rape. *Id.* ¶¶ 92-93. The VPVA Office is separate from the Title IX office and provides victims information about their rights under New Jersey Sexual Assault Victims' Bill of Rights and Rutgers' sexual misconduct policies and procedures. *Id.* ¶ 65. VPVA took a confidential report from Ms. Doe and gave her the contact information for Sexual Assault and Violence Education ("SAVE") of Essex County, the state-designated Sexual Violence Program for Essex County. Defs. Facts ¶ 12. Najmi reported the sexual assault to the Title IX Office three days later on March 9, 2020. Pl. Facts ¶ 90; Defs. Resp. Facts ¶ 90.

On Sunday, March 8, 2020, Ms. Doe reported to Beth Israel Hospital, which contacted the RUPD. Defs. Facts ¶¶ 13-14. RUPD initiated an investigation into the reported assault. *Id.* ¶ 15. That same day, RUPD informed Dean Erica Williams of the sexual assault report received from Beth Israel Hospital. *Id.* ¶ 17. On March 9, 2020, Dean Williams forwarded RUPD's e-mail to Rutgers' Title IX office and requested that Residence Life impose a ban barring T.D. at all residence halls. *Id.* ¶ 18. The residence hall ban was issued the same day. *Id.* ¶ 19.

### D.    Onset of the COVID-19 Pandemic

On March 10, 2020, Rutgers suspended all classes effective March 12, 2020 in light of the COVID-19 pandemic. *Id.* ¶ 25. All students were directed to immediately leave campus. *Id.*

Residence hall access was restricted to residents only and guests were not allowed in. *Id.* ¶ 26. Later that month, Rutgers extended suspension of all in-person instruction and conducted courses remotely for the remainder of the Spring semester of the 2019-2020 academic year and continuing throughout the 2020-2021 academic year. *Id.* ¶ 28.

While on spring break, Ms. Doe informed Rutgers that she no longer wished to remain in on-campus housing because she felt safer at home than on campus. *Id.* ¶ 30 (citing Maderer Decl., Ex. 1, 67:18-68:1 ("Doe Tr."); Pl. Resp. Facts ¶ 30 (citing Doe Tr., 67:18-68:6). In April 2020, Ms. Doe signed a lease to live in an off-campus apartment near campus for the 2020-2021 academic year. Defs. Facts ¶ 31. Ms. Doe completed the Spring 2021 semester in Newark and moved out of New Jersey on May 14, 2021. *Id.* ¶ 37. She then transferred to Baylor University. *Id.* ¶ 39.

### E.    The Title IX Investigation

#### i.    *Dr. Strother and Ms. Doe's communications*

On March 9, 2020 Rutgers' Title IX office, through Dr. Strother, contacted Ms. Doe and explained the Title IX process and possible interim support measures. *Id.* ¶ 20 (citing Maderer Decl., Exs. 21-22).[3] Ms. Doe responded on March 16, 2020 requesting additional information about the Title IX process and filing a complaint. *Id.* ¶ 40. Dr. Strother replied that same day and offered to discuss the reported sexual assault in person or over the phone. *Id.* ¶ 41 (citing Maderer

---

[3] Ms. Doe attempts to dispute this by stating there is no evidence that Dr. Strother informed her about available interim safety measures. Pl. Resp. Facts ¶ 20 (citing Pl. Facts ¶ 111). However, the relevant deposition testimony Ms. Doe cited is as follows: Q: When did you act to inform Ms. Doe about her rights to receive interim safety measures?" A: I can't recall my outreach to her. D.E. 108-4, Ex. 4, 139:22-24 ("Strother Tr."). The e-mail cited by Defendants states: "Rutgers has several resources that you can contact for support. The confidential resources listed in the attached brochure will not share any information that you discuss with them[.]" Maderer Decl., Ex. 22. Ms. Doe does not point to evidence disputing that she received the e-mail.

Decl., Ex. 27 at RUTGERS003444-45). Dr. Strother advised Ms. Doe that the Rutgers Office of Title IX and ADA Compliance "only has jurisdiction over Rutgers University students and/or parties affiliated with Rutgers University" and if the matter involved a student from another university, "the information reported to [the Rutgers office] would be shared with the Title IX Coordinator of the school the Respondent attends[.]" Maderer Decl., Ex. 27 at RUTGERS003444-45. The parties dispute what "jurisdiction" refers to. Ms. Doe seems to think this meant Rutgers could take no action, including a Title IX investigation. Pl. Facts ¶ 126. Defendants respond that it refers to specific actions against T.D., such as suspension or no-contact orders. Defs. Resp. Facts ¶ 126.

On March 17, 2020, Ms. Doe replied that she wanted to file a Title IX report and asked to meet with Dr. Strother. Defs. Facts ¶ 42. On March 25, 2020, she again requested to meet with Dr. Strother and specified a requested date of March 31, 2020 for the meeting. *Id.* ¶ 43. As many Student Affairs offices were working remotely, Dr. Strother asked to discuss the matter via phone, and Ms. Doe agreed. *Id.* ¶¶ 44-45. From March 30 to April 2, 2020, Dr. Strother communicated with Ms. Doe to gather information and finalize her Title IX complaint. *Id.* ¶ 46. On April 2, 2020, Dr. Strother, with Ms. Doe's consent, shared her Title IX complaint with NJIT in connection with its investigation into the matter. *Id.* ¶ 47; Defs. Reply Facts ¶ 47 (citing Maderer Decl., Ex. 67).

*ii.     Interim protective measures during pendency of investigation*

*a.     Academic accommodations requests*

On March 15, 2020, Ms. Doe asked Najmi about an accommodation to take certain classes pass/fail and Najmi recommended she take a lower grade in one course and provided a link to information about pass/no credit grades. Najmi Tr., Ex. 15. In her CARE notes, Najmi wrote that

7

Ms. Doe expressed she was considering withdrawing from a course and CARE advised her to connect with her academic advisor. Najmi Tr., Ex. 6. Ms. Doe ultimately decided to drop the course. Pl. Facts ¶ 122.

On March 26, 2020, Najmi checked in on Ms. Doe, and Ms. Doe noted she was falling behind on her work. Najmi Tr., Ex. 13. Ms. Doe states that Najmi "did not offer her any accommodations or referral to the Title IX Office for support." Pl. Facts ¶ 131 (citing Doe Tr., Ex. 4). Defendants respond that the Title IX office had already provided Ms. Doe with a policy containing academic accommodations. Defs. Resp. Facts ¶ 131 (citing D.E. 108-8, Ex. 22).

Ms. Doe ended the Spring 2020 semester with a lower GPA than her Fall 2019 semester. Pl. Facts ¶ 140.

> b.    *Requests for bans against T.D.*

On July 7, 2020, Ms. Doe requested that Rutgers impose a campus ban against T.D., banning him from campus until May 2023 as a proposed resolution to her Title IX complaint. Defs. Facts ¶ 55. In response to the request, Dr. Strother inquired with the RUPD whether such a ban could be implemented. *Id.* ¶ 56. The parties dispute whether Rutgers may impose campus bans. They agree that there is no written policy governing when RUPD can impose a campus ban on a third party such as T.D., *id.* ¶ 57, but disagree as to who may enforce it. Defendants aver that only the RUPD can impose and enforce campus bans, and its practice was to not issue such bans unless the subject was either formally charged with a crime or found in violation of university policy. *Id.* ¶¶ 56-57 (citing Strother Tr., 110:2-111:6, 121:13-122:16; Maderer Decl., Ex. 31 at RUTGERS000440-46; Williams Tr., 55:7-16). Ms. Doe contends that Rutgers has authority to issue campus bans against third parties. Pl. Facts ¶ 54 (citing Gunkel Tr., 42:19-45:3; D.E. 108-4, Ex. 5, 50:4-14, 89:11-94:24 ("Rein Tr.")). Relatedly, the parties also dispute whether a no-

contact order was an available Title IX remedial measure.  Pl. Facts ¶ 64 (citing Dellatore Tr., 66:3-67:19); Def. Resp. Facts ¶ 64 (citing Strother Tr., 114:22-116:7).

Rutgers imposed a permanent residence hall ban on T.D. on July 9, 2020.  Defs. Facts ¶ 60.  On July 16, 2020, RUPD determined that a campus ban was not appropriate and told the Title IX office Ms. Doe could apply for a temporary restraining order.  *Id.* ¶ 59.  On July 28, 2020. Ms. Doe requested that Rutgers develop a "safety plan" for her as an interim safety measure ahead of her anticipated return to campus in August.  *Id.* ¶ 63.  Rutgers offered Ms. Doe the option for a safety officer to escort her when she planned to go to campus.  *Id.* ¶ 64.  The parties dispute whether or not Ms. Doe ever took advantage of such a safety plan.  Rutgers avers that Ms. Doe did not, *id.* ¶ 65, while Ms. Doe disputes whether such a plan was ever issued.  Pl. Resp. Facts ¶ 65.  The relevant e-mail cuts off before it is clear whether the plan was implemented.  Doe Tr., Ex. 28.  On October 16, 2020, Ms. Doe obtained a Temporary Protective Order ("TPO") against T.D.  Defs. Facts ¶ 69.

### iii.    Rutgers' Title IX investigation process

Alicia Ponce was the Title IX investigator assigned to Ms. Doe's case.  *Id.* ¶ 49.  However, the record is not clear as to when that assignment transpired.  Ms. Doe states that Ponce was not assigned until July 2020, five months after Ms. Doe's initial report.  Pl. Resp. Facts ¶ 49 (citing Pl. Facts ¶ 156, citing D.E. 108-6, Ex. 12, 207:4-14 ("Ponce Tr.")).  The email on which this date is based, Ponce Tr., Ex. 16, only includes communication from Dr. Strother to Ms. Ponce stating: "NJIT has decided not to pursue the matter under Title IX. Therefore, I think we need to request to interview the Respondent."  The Court cannot discern whether this constitutes the official assignment of Ms. Ponce as Title IX investigator.  Ponce did not reach out to Ms. Doe as the investigator until September of 2020.  Strother Tr., 325:22-326:1.

Defendants aver that the timing of Ms. Ponce's involvement is immaterial because Dr. Strother was already gathering information prior to her assignment, but does not clarify when she was assigned.  Defs. Reply Facts ¶ 49.  Dr. Strother testified that he did not know when Ms. Ponce was first asked to gather additional information, and that "I know initially I was gathering information related to the matter . . . I was trying to gather as much information as possible before sharing it with Alicia."  Strother Tr., 108:19-109:2.

Ponce's background and job responsibilities are not disputed.  Ponce testified that she was the only person whose full-time job it was to conduct investigations.  Ponce Tr., 87:14-17.  Ms. Doe's case was Ponce's first Title IX investigation involving a student complainant and a third-party respondent unaffiliated with Rutgers, and her first investigation to go through the full investigative process.  Defs. Facts ¶¶ 76-77.  As a result, this was Ponce's first Title IX case in which she had to prepare a report.  *Id.* ¶ 78.  Ms. Doe avers that Ponce had no familiarity with third-party sexual misconduct policies and procedures.  Pl. Facts ¶ 72 (citing Ponce Tr., 32:4-10, 47:22-48:10, 55:10-14, 57:4-58:24, 148:7-23, 193:22-194:5).  However, Defendants dispute this, noting Ponce stated that she did not remember when asked if she knew about those specific policies, Ponce Tr., 48:1-5, and that the record reflects "[a]ll training about Title IX would provide information about how to handle a report for any offender. It would not necessarily specifically call out a third-party specifically."  Defs. Resp. Facts ¶ 73 (citing Dellatore Tr., 35:10-16).  The parties do agree, however, on why, to an *extent*, the investigation was delayed.  Title IX investigations are conducted in person; however, due to the COVID-19 pandemic, the investigation shifted to a virtual process, which added some delay to the report's completion.  Defs. Facts ¶ 79.  Ponce was also diagnosed with Bell's Palsy during her investigation, which required her to take some time off from work. *Id.* ¶ 80.

In the course of its separate investigation, RUPD contacted T.D. for an interview in Mid-March 2020, but T.D. refused to cooperate. *Id.* ¶ 23 (citing Maderer Decl., Ex. 14 at RUTGERS005135-37). Ms. Doe disputes this timeline, and states that Defendants did not ask to interview T.D. until July 30, 2020. Pl. Resp. Facts ¶ 23 (citing D.E. 110-3).[4] Dr. Strother also contacted NJIT and T.D.'s attorney about interviewing him, but T.D. refused to cooperate. Defs. Facts ¶ 51. Accordingly, Rutgers' Title IX office requested T.D.'s statement submitted in connection with NJIT's disciplinary proceedings, which NJIT provided on August 26, 2020. *Id.* ¶ 52. Ponce herself did not prepare and send questions to T.D. Pl. Facts ¶ 181.

Ponce completed her initial draft of the Title IX investigative reported in October 2020. Defs. Facts ¶ 74. Dr. Strother revised the report and provided sign-in records from the night of the incident for inclusion. Ponce Tr., Ex. 23A. In early December, Ms. Doe's counsel asked to review the report and have a grievance process update, but Dr. Strother did not respond. Pl. Facts ¶ 192.

After several further revisions, on December 22, 2020, Dr. Strother forwarded the report to Lisa Grosskreutz, Director of Rutgers' Office of Employment Equity ("OEE"), to determine whether T.D. violated University Policy 60.1.28: Policy Prohibiting Sexual Harassment, Sexual Violence, Relationship Violence, Stalking, and Related Misconduct by Employees and Third Parties. Defs. Facts ¶ 82. The Title IX office originally investigated Ms. Doe's complaint under University Policy 10.3.12: the Student Policy Prohibiting Sexual Harassment, Sexual Violence, Relationship Violence, Stalking, and Related Misconduct, instead of Policy 60.1.28. *Id.* ¶ 83. Policy 10.3.12 lists campus bans as available Title IX remedies. Pl. Facts ¶ 33. Both policies proscribe the same conduct and use the same definitions, but Policy 10.3.12 applies to Rutgers

---

[4] The parties agree that Rutgers' Title IX investigation is separate from RUPD's criminal investigations. Pl. Facts ¶ 68; Defs. Resp. Facts ¶ 68.

students' sexual misconduct, while Policy 60.1.28 applies to third parties and employees' sexual misconduct. Defs. Facts ¶¶ 84, 86. In addition, Policy 10.3.12 is administered by the Rutgers Office of Title IX and ADA Compliance, whereas Policy 60.1.28 is administered by the Rutgers OEE. *Id.* ¶ 87. Policy 60.1.28 governed Ms. Doe's complaint because T.D. was third-party. *Id.* ¶ 85. Accordingly, OEE Director Grosskreutz had ultimate responsibility in determining whether Policy 60.1.28 was violated after receipt of an investigative report. *Id.* ¶ 88.

On September 17, 2020, Ms. Doe's counsel forwarded Ms. Doe's supplemental statement to Rutgers for purposes of Rutgers' Title IX investigation. *Id.* ¶ 53. The next day, Ponce sent Ms. Doe a set of questions to answer for the Title IX investigation, which Ms. Doe answered the next day. *Id.* ¶ 54.

Four months later, in January 2021, Ponce interviewed witness A.N. Defs. Reply Facts ¶ 49. Ponce testified that she did not conduct that interview until then because she "had her statement, and I was just going to base my [] investigation off of the statement that she had already provided to NJIT." Ponce Tr., 201:5-12. Ponce further testified that she was asked to conduct that interview by OEE Director Grosskreutz. *Id.*, 204:13-17. She also contacted another witness, K.J., for purposes of the investigation, but K.J. refused to be interviewed. Defs. Facts ¶ 50. Ponce did not interview Najmi or the security officer who allowed T.D. to sign in as Ms. Doe's guest on March 6, 2020. Pl. Facts ¶ 172.

### iv.    Rutgers' determination

On February 1, 2021, Ms. Doe filed a Title IX administrative complaint against Rutgers with the U.S. Department of Education, which Rutgers received notice of on February 23, 2021. *Id.* ¶ 202. OEE Director Grosskreutz sent Ms. Doe and her counsel the Letter of Determination (the "Determination") finding T.D. violated Policy 60.1.28 on February 25, 2021. Defs. Facts ¶

89.  On March 12, 2021, T.D. was served with Ms. Doe's TPO, and on March 18, 2021, RUPD permanently banned T.D. from Rutgers properties.  *Id.* ¶ 91.  Rutgers advised Ms. Doe's counsel of the campus ban on March 22, 2021.  *Id.* ¶ 92.  T.D. appealed the Determination, which Rutgers affirmed on April 1, 2021.  *Id.* ¶ 94.  Rutgers advised Ms. Doe's counsel of the appeal determination (the "Appeal Determination") on April 1, 2021.  *Id.* ¶ 95.  Following the Appeal Determination, Rutgers barred T.D. from enrolling in any Rutgers courses for three years.  *Id.* ¶ 96.  T.D. again appealed from the sanctions on June 11, 2021, which Rutgers affirmed on June 24, 2021.  *Id.* ¶ 97.

## II.    PROCEDURAL HISTORY

Ms. Doe commenced this action on December 30, 2021.  D.E. 1.  Discovery closed on July 1, 2023.  D.E. 86.  Ms. Doe moves for partial summary judgment on the Title IX claims: Count I (deliberate indifference); Count II (sex discrimination); and Count III (hostile environment).  Pl. Mot.  Defendants oppose.  D.E. 107-9 ("Defs. Opp'n").  Ms. Doe replies.  D.E. 108-15 ("Pl. Reply").  Defendants move for summary judgment on all Title IX claims, as well as Count IV, negligence under the New Jersey Tort Claims Act ("TCA") based on Defendant Dr. Strother's alleged post-assault failure to adequately initiate a grievance process or issue protective measures. Defs. Mot.  Ms. Doe opposes.  D.E. 110-1 ("Pl. Opp'n").  Defendants reply.  D.E. 107-14 ("Defs. Reply").

## III.    LEGAL STANDARD

A court may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party.  *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d

Cir, 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.* Under Rule 56, a court must view the evidence presented in the light most favorable to the non-moving party. *See Anderson*, 477 U.S. at 255. However, "conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment," *Blair v. Scott Specialty Gases*, 283 F.3d 595, 608 (3d Cir. 2002), and statements of undisputed material facts may not "rel[y] primarily on speculation and legal conclusions" or "fail[] to genuinely dispute the facts[.]" *Buxton v. Dougherty*, 821 F. App'x 70, 71 n.2 (3d Cir. 2020).

The movant bears the initial responsibility to establish the basis for the motion for summary judgment and to identify the portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the non-moving party bears the burden of proof on an issue, the moving party's initial burden can be met simply by "pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

After the moving party has met its initial burden, the non-moving party must set forth specific facts showing that there is a genuinely disputed factual issue for trial by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

Where, as here, both parties move for summary judgment, the governing standard "does not change." *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016) (quoting *Appelmans v. City of Phila.*, 826 F.2d 214, 216 (3d Cir. 1987)). "The court must consider the motions independently, in accordance with the principles outlined above." *Indus. Corner Corp. v. Pub. Serv. Mut. Ins. Co.*, No. 20-6677, 2023 WL 1860626, at *5 (D.N.J. Feb. 8, 2023).

## IV.    ANALYSIS[5]

Title IX provides that no one "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX contains an implied private right of action, *Gebser v. Lago Vista Ind. Sch. Dist.*, 524 U.S. 274, 281 (1998), and "such an implied private damages action may be employed to hold educational institutions accountable for student-on-student harassment." *McAvoy v. Dickinson Coll.*, 115 F.4th 220, 227 (3d Cir. 2024) (citing *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 633 (1999)). This encompasses discrimination "in the form of a recipient's *deliberate indifference* to a teacher's sexual harassment of a student . . . or to sexual harassment of a student by another student." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005) (emphasis added).

The parties devote numerous pages to arguing over the proper standard for the claims at issue, and whether "deliberate indifference" is a threshold element of any claim brought against a funding recipient under Title IX. Title IX places a duty on funding recipients to not discriminate on the basis of sex. *Hall v. Millersville Univ.*, 22 F.4th 397, 404 (3d Cir. 2022). The Court

---

[5] As a threshold matter, the Court notes that it need not address Defendants' argument regarding the inadmissibility of Ms. Doe's liability expert, Defs. Mot. at 18, because as Defendants observe, Ms. Doe does not rely on the expert in connection with the parties' motions. Defs Reply at 3 n.1.

therefore first clarifies what the actual counts, and accompanying elements, are at issue in these motions.

Defendants argue that the deliberate indifference standard applies to all three Title IX counts: (1) deliberate indifference; (2) sex discrimination; and (3) hostile environment.  Defs. Mot. at 6.

Ms. Doe first argues that the *Gebser* Court distinguished a sex discrimination liability framework from the deliberate indifference liability framework applied in earlier cases, Pl. Mot. at 10 n.6, but this is not quite right.  The Court merely clarified in *Gebser* whether an educational institution can be said to violate Title IX based on principles of *respondeat superior* and constructive notice.  524 U.S. at 275.  It then held that "the response must amount to deliberate indifference to discrimination."  *Id.* at 290.  To prevail on a hostile educational environment claim, Ms. Doe must show that sexual harassment occurred that was "'so severe pervasive, and objectively offensive' that it deprived her of 'access to the educational opportunities or benefits'" provided by Rutgers, as well as show that Rutgers was "'deliberately indifferent to known acts' of sexual harassment."  *Yan Yan v. Penn Univ.*, 529 F. App'x 167, 171 (3d Cir. 2013) (quoting *Davis*, 526 U.S. at 647, 650).  Therefore, she must show deliberate indifference for all three claims.

Ms. Doe cites to six purported ways that Rutgers demonstrated deliberate indifference towards the sexual assault.  Pl. Mot. at 19.  She next argues that Rutgers discriminated against her based on her sex by misrepresenting that it did not have Title IX jurisdiction over her case.  *Id.* at 9.  Lastly, she argues that Rutgers created a hostile educational environment by failing to adequately sanction T.D. during the pendency of the investigation.  *Id.* at 30-31.  Ms. Doe therefore does not really bring separate legal claims under Title IX, but instead cites to different *actions* that demonstrate "deliberate indifference to sexual harassment of a student" which "can constitute sex

discrimination under Title IX." *M.H. by D.H. v. C.M.*, No. 20-1807, 2020 WL 6281686, at *5 (D.N.J. Oct. 27, 2020) (citing *Davis*, 526 U.S. at 643). In fact, her arguments consist of examples of Rutgers' purported discrimination and/or deliberate indifference at different stages in its response to her sexual assault, which in the aggregate amount to a perceived failure to properly investigate the assault, implement protections for her, and punish T.D. Otherwise put, that by reneging on its obligations to promptly and thoroughly investigate her claims, Rutgers acted with deliberate indifference to Ms. Doe's sexual assault. The Court will therefore analyze these claims together.

### A.    Issues of Material Fact Exist as to the Title IX Claims

To prevail on a Title IX deliberate indifference claim, sex-discrimination claim, or hostile environment claim, Ms. Doe must show: Rutgers receives federal funds; sexual harassment occurred; Rutgers had substantial control over the harasser and had actual knowledge of the harassment; Rutgers was deliberately indifferent to the harassment; and the harassment was so severe, pervasive, and objectively offensive that it deprived Ms. Doe of her access to the educational opportunities or benefits provided by the school. *L.S. v. Hanover Area Sch. Dist.*, No. 22-234, 2024 WL 2393038, at *4 (M.D. Pa. May 23, 2024) (citing *Hall*, 22 F.4th at 408; *Davis*, 526 U.S. at 645-50); *see also Handley v. Rowan Univ.*, No. 21-16889, 2022 WL 4115730, at *6 (D.N.J. Sept. 9, 2022) (citing *Davis*, 526 U.S. at 633) (sex-discrimination elements); *Yan Yan*, 529 F. App'x at 171 (quoting *Davis*, 526 U.S. at 647, 650) (hostile educational environment elements).

"To establish deliberate indifference, a plaintiff must show that the school knew about the plaintiff's sexual assault and ensuing harassment and failed to respond adequately." *Keel v. Del. State Univ. Bd. of Trs.*, No. 17-1818, 2019 WL 494621, at *6 (D. Del. Feb. 8, 2019) (citing *Gebser*, 524 U.S. at 290). Defendants concede that Rutgers receives federal funding and had actual notice

of the March 6, 2020 incident after it occurred, but dispute the remaining elements.  Defs. Opp'n at 5 n.2.

<em>i.     The parties do not dispute that sexual harassment occurred</em>

Although Defendants state that it is "not true" that the parties agree that Ms. Doe suffered sexual harassment, it simultaneously agrees that Rutgers found in Ms. Doe's favor in finding T.D. violated Rutgers' policy and concedes that it had actual notice.  *Id.*  Since the Court does not see how Defendants can concede Rutgers had actual knowledge *of the harassment* without conceding harassment occurred, it finds that the parties do agree on this element.  And in any event, the parties do not dispute that OEE Director Grosskreutz sent Ms. Doe and her counsel the Letter of Determination finding T.D. violated Policy 60.1.28 on February 25, 2021.  Defs. Facts ¶ 89.  Policy 60.1.28 is titled Policy Prohibiting Sexual Harassment, Sexual Violence, Relationship Violence, Stalking, and Related Misconduct by Employees and Third Parties.  *Id.* ¶ 82.  Therefore, the element of the existence of sexual harassment is met.

<em>ii.     There are a genuine issues of material fact as to substantial control</em>

Ms. Doe relies exclusively on the Third Circuit's decision in *Hall* to argue she has met her burden to establish Rutgers had substantial control over T.D.  Pl. Mot. at 17 (citing *Hall*, 22 F.4th at 403-07).  Defendants rebut by noting the Third Circuit only found that genuine disputes of material facts existed.  Defs. Opp'n at 5-6 (citing *Hall*, 22 F.4th at 408-09).  Here, like in *Hall*, there is a genuine issue of material fact as to whether Rutgers had substantial control over T.D.

The record reflects that Rutgers had policies in place to monitor residence hall guests, such as a requirement to present identification to security while a Rutgers student escorted them in and out.  Pl. Facts ¶ 59.  Policy 60.1.28 also governs misconduct by third parties.  Defs. Facts ¶ 82.  Rutgers unquestionably exercised *some* control over T.D. by imposing a residence hall ban barring

him from all Rutgers residence halls on March 9, 2020, and a permanent residence hall ban on him on July 9, 2020. *Id.* ¶¶ 19, 60. The parties dispute who has enforcement power over campus bans. Defs. Resp. Facts ¶ 64. Although the parties agree there is no written policy governing when such a ban can be imposed against a third-party, Ms. Doe avers that Rutgers can, while Defendants maintain that RUPD had a practice to not issue such bans absent a formal criminal charge or university policy violation. *See supra,* Section E.ii.b. This evidence is enough to create issues of fact, as a determination whether Rutgers had control over T.D. is not a "limited inquiry" into its "*formal* disciplinary authority, but a broader examination of the degree of control [Rutgers] had over him and its ability to 'take remedial action.'" *Hall*, 22 F.4th at 409 (citing *Davis*, 526 U.S. at 644) (emphasis in original). However, Ms. Doe has not met her burden entitling her to summary judgment on this element because there are disputes as to the extent of Rutgers' remedial enforcement powers. Therefore, the Court will **DENY** Ms. Doe's Motion.

### *iii.    Issues of fact exist as to deprivation of educational opportunities*

Defendants argue that the Court must grant their motion—and deny Ms. Doe's—because a single incident of sexual assault cannot constitute severe and pervasive harassment. Defs. Mot. at 9-10. However, as they note, the Third Circuit has not addressed this question. Defs. Reply at 6. Instead, this Court is persuaded by other courts that have "found 'sufficiently severe' harassment under Title IX from a single incident," where "the conduct consists of extreme sexual assault or rape." *Carabello v. New York City Dep't of Educ.*, 928 F. Supp. 2d 627, 643 (E.D.N.Y. 2013). Rutgers found that Ms. Doe "could not consent to sexual activity during the time period in question." Maderer Decl., Ex. 56. This Court declines to find that someone too intoxicated to consent to sex has not shown severe or pervasive harassment.

19

Having found that Ms. Doe's harassment was sufficiently severe and pervasive, the Court must also address whether Rutgers "effectively bar[red] the victim's access to an educational opportunity or benefit." *Davis*, 526 U.S. at 633. "[T]he harassment must have [had] a concrete, negative effect on the victim's education, which may include dropping grades, becoming homebound or hospitalized due to harassment, physical violence, or physical exclusion from a school resource." *Carabello*, 928 F. Supp. 2d at 643 (cleaned up). As explained below, the Court finds that genuine issues of fact exist as to whether or not Ms. Doe's access to her educational benefits was impeded.

This case is certainly unique in that the aftermath of the sexual assault took place during a pandemic. Indeed, Defendants rely on the switch to virtual learning to downplay Ms. Doe's fears or needs for remedial action. Defs. Mot. at 11-12. *First*, a reasonable jury could find that Ms. Doe's grade point average drop to a 3.154 in the Spring semester of 2020 from a 3.409 in Fall 2019 is significant. Defs. Facts ¶ 98. As the record reflects, on March 15, 2020, Ms. Doe asked Najmi about taking classes pass/fail. Najmi Tr., Ex. 15. She also told Najmi she was feeling overwhelmed with her classes and considered withdrawing from a course. *Id.*, Ex. 9. Ms. Doe decided to withdraw from a course due to her falling behind on her schoolwork. Pl. Facts ¶ 140.

A reasonable jury could also find that a lack of affirmative options for academic accommodations impeded Ms. Doe's access to educational opportunities. Defendants do not dispute that in response to Ms. Doe's questions about her courses, Najmi did not offer accommodations or refer her to the Title IX office, Defs. Resp. Facts ¶ 121, but state that the Title IX office already provided her with a policy containing academic accommodations. *Id.* (citing D.E. 108-8, Ex. 22). A brochure attached to the Title IX office's March 9, 2020 correspondence may, or may not, suffice for purposes of this element. *Id.*

20

Additionally, the Court disagrees with Defendants that the record indisputably shows Ms. Doe's fear of again encountering her assailant was "objectively unreasonable." Defs. Opp'n at 12. It is true that "the mere prospect of the alleged assailant's entering the victim's range of perception 'ma[kes] [the plaintiff] liable or vulnerable to harassment' only if the university fails to restrict the conduct of an alleged assailant after the sexual misconduct." *Garrett v. Univ. of South Florida Bd. of Trs.*, 448 F. Supp. 3d 1286, 1299 (M.D. Fla. 2020). However, Rutgers' implementation of a residence hall ban on March 9, 2020 limited to 24-48 hours raises a genuine issue of fact as to the qualitative difference in Ms. Doe's potential distress had more severe restrictions been implemented. Pl. Facts ¶ 115.

Defendants also deem the lack of notice as to this temporary residence hall ban immaterial because (1) all residence halls were closed to guests on March 10, 2020 due to the pandemic and (2) Ms. Doe knows that Rutgers had security policies for guests. Defs. Resp. Facts ¶ 116. However, the Court finds that a reasonable factfinder could determine that a longer residence hall ban or other more restrictive measures could have had an impact on Ms. Doe's distress. More specifically, it could determine that even one day of fear of (perceived) "wholly unrestricted" conduct is objectively unreasonable. *Garrett*, 448 F. Supp. 3d at 1299.

### iv.   *A reasonable jury could find that Rutgers acted with deliberate indifference*

It is true that the burden to demonstrate deliberate indifference is high, and the defendant's response must be "clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648. Yet, even in spite of this high bar, the Court finds that there are issues of fact that a reasonable factfinder could use to find that Rutgers was deliberately indifferent in its response to Ms. Doe's sexual assault. The parties extensively dispute both the thoroughness and the length of time it took for the investigation to conclude. A victim's "discontent with a school's investigation does not

establish a Title IX violation," *McAvoy v. Dickinson Coll.*, No. 20-1327, 2023 WL 6276670, at *7 (M.D. Pa. Sept. 26, 2023), *aff'd* 115 F.4th 220, but the record in this case creates issues of fact that stretch beyond mere discontent.

Ms. Doe expressed to Dr. Strother her interest in taking the next steps in filing a Title IX complaint on March 17, 2020. Defs. Facts ¶ 42. Rutgers began its investigation by applying the wrong policy—which did not apply to third-parties. *Id.* ¶ 83. The Determination was sent to Ms. Doe and her counsel on February 25, 2021. *Id.* ¶ 89. Rutgers' internal policies stated that it would make every effort to conclude an investigative process within 60 calendar days, with extensions only for good cause provided in writing with a new timeline and explanation for the need for an extension. Pl. Facts ¶ 41. This extreme delay is deemed "immaterial" by Defendants, Def. Resp. Facts ¶ 41, but it is notable that the unaddressed explanation in conformity with this policy is distinguishable from instances when the defendant with a similar deadline objective notified the plaintiff "in writing on the first day of the investigation that the process would likely go beyond sixty days because it was initiated just before the holidays, when the school would be closed." *McAvoy*, 115 F.4th at 229. It does not appear from the record that Rutgers made any such communicative effort.

The record is also not clear as to when Ponce was assigned the Title IX investigator, but at earliest, it was July 2020, five months after Ms. Doe's initial report. Pl. Resp. Facts ¶ 49. This is distinguishable from other instances of a university "timely appoint[ing] Title IX investigators[.]" *Doe v. Trs. of Columbia Univ. in City of New York*, No. 23-960, 2024 WL 2013717, at *2 (2d Cir. May 7, 2024). Ponce also did not reach out to Ms. Doe as the investigator until September of 2020. Strother Tr., 325:22-326:1. This was purportedly "immaterial" because Dr. Strother was already gathering information, but neither party points to evidence suggesting that the initial

information gathering was substantive or had any material effect on the investigation.  Defs. Reply Facts ¶ 50.

The parties also dispute when Defendants attempted to interview T.D.  *See supra*, Section E.b.iii.  Ponce did not prepare and send questions to T.D.  Pl. Facts ¶ 181.  Ponce also did not reach out to interview witnesses K.J. and A.N. until January 2021, because she believed the preexisting statements she had were sufficient.  Def. Resp. Facts ¶ 199.  She also did not interview Najmi or the security officer who allowed T.D. to sign in as Ms. Doe's guest on March 6, 2020.  Pl. Facts ¶ 172.  Even with the switch to a remote investigation, a reasonable jury could find that this lean level of investigatory work and ensuing delay rose to the level of deliberate indifference.

This differs from other investigations that took longer, but the evidence did not support a finding that defendant was deliberately indifferent because "[t]he investigation itself was a significant undertaking: it required hiring outside investigators, numerous interviews, a lengthy report, and a review panel process to ensure the fairness of the proceeding."  *McAvoy*, 115 F.4th at 229; *see also Doe v. Trs. of Columbia Univ. in City of New York*, No. 21-5839, 2022 WL 3666997, at *18 (S.D.N.Y. Aug. 25, 2022), *aff'd,* 2024 WL 2013717 (in addition to pandemic-related delays, length of investigation resulted from "among other things, a cross-complaint filed by Roe; numerous interviews of multiple witnesses, a substantial record").

While Ms. Doe raises numerous examples of conduct that potentially amount to deliberate indifference, *see* Pl. Mot. at 19-27, the Court finds that the above issues of fact pertaining to the thoroughness and length of the investigation suffice to **DENY** Defendants' Motion.

### B.    Non-Pecuniary Damages are Unavailable to Ms. Doe

Defendants ask this Court to apply the holding in *Cummings v. Premier Rehab Keller, P.L.L.C.,* 596 U.S. 212 (2022) that non-pecuniary damages are unavailable to statutes passed

pursuant to Congress' authority under the Constitution's Spending Clause. Defs. Mot. at 24. The Court is persuaded by other decisions in this district finding *Cummings* bars claims for compensatory emotional damages under Title IX. *See, e.g.*, *A.T v. Oley Valley Sch. Dist.*, No. 17-4983, 2023 WL 1453143, at *4 (E.D. Pa. Feb. 1, 2023); *Doe v. Moravian Coll.*, No. 20-377, 2023 WL 144436, at *9 (E.D. Pa. Jan. 10, 2023). Accordingly, Ms. Doe may not recover non-pecuniary damages.

### C.    Ms. Doe's Negligence Claim is Barred

Defendants argue that Ms. Doe's negligence claim is barred because she did not timely provide notice under the TCA. Defs. Mot. at 17. The Court agrees.

Under N.J.S.A. 59:8-8, a notice of claim "shall be presented . . . not later than the 90th day after accrual of the cause of action." The parties do not dispute that Ms. Doe served her notice of claim on June 29, 2021, Defs. Resp. Facts ¶ 4, which makes a claim timely if it accrued on or after March 31, 2021. The date of accrual is when a party "knows or should know that the injury occurred[.]" *Pederson v. NCAA*, No. 14-2544, 2015 WL 7573200, at *3 n.5 (D.N.J. Nov. 24, 2015). Ms. Doe appears to concede that she was cognizant of the alleged injury when she filed an administrative complaint with the U.S. Department of Education (consisting of the same facts in the TCA notice). Defs. Mot. at 18; Pl. Opp'n at 23 ("Put another way, Defendants' violations were ongoing, even after her Title IX Complaint to the U.S. Department of Education."). However, she argues that the continuing violation doctrine applies because the appeals process extended beyond the date she filed her Title IX complaint. Pl. Opp'n at 23-24 (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002); *O'Connor v. City of Newark*, 440 F.3d 125, 128 (3d Cir. 2006)).

Ms. Doe received a favorable determination on February 25, 2021. Pl. Facts ¶ 203. The Court disagrees that the continuing violation doctrine applies. The record does not reflect that Ms. Doe's Title IX right to an equitable process was violated when Defendants "did not provide Ms. Doe with a copy of either of T.D.'s appeals or allow her to respond to them before issuing decisions[.]" Pl. Opp'n at 23. The non-appealing party does not have an opportunity to respond to appeals under Rutgers' policy. D.E. 108-7, Ex. 17, 152:19-153:1. Accordingly, Ms. Doe's notice of claim was untimely and the Court will **GRANT** summary judgment in Defendants' favor as to the negligence claim.

## V.    CONCLUSION

For the reasons above, Plaintiff's summary judgment motion, D.E. 108, is **DENIED** and Defendants' summary judgment motion, D.E. 107 is **DENIED in part** and **GRANTED in part.** The Court will **DISMISS** Count IV. The remaining counts are Counts I-III. Plaintiff may not recover non-pecuniary damages as to those counts. An appropriate Order follows.

Dated**: March 11, 2025**

_Evelyn Padin_

Evelyn Padin, U.S.D.J.